PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1895
_____


IN RE:  NORTEL NETWORKS, INC., ET AL.,
Debtors


TRUSTEE OF NORTEL NETWORKS
UK PENSION PLAN;
BOARD OF THE PENSION PROTECTION FUND,
Appellants
_____


On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-10-cv-00230)
District Judge:  Honorable Leonard P. Stark
_____


Argued September 13, 2011


Before:  SLOVITER, SCIRICA, and SMITH, *Circuit Judges*


(Filed: December 29, 2011)
_____


Marc Abrams
Brian E. O'Connor  (Argued)
Willkie, Farr & Gallagher
New York, NY  10019

Justin R. Alberto
Charlene D. Davis
The Bayard Firm

Wilmington, DE  19899

       Attorneys for Appellants

Derek C. Abbott
Ann C. Cordo
Morris, Nichols, Arsht & Tunnell
Wilmington, DE  19899

James L. Bromley
Deborah M. Buell   (Argued)
Neil P. Forrest
Cleary, Gottlieb, Steen & Hamilton
New York, NY  10006

       Attorneys for Debtors – Appellee Nortel Networks

David H. Botter
Fred S. Hodara
Akin, Gump, Strauss, Hauer & Feld
New York, NY  10036

L. Rachel Lerman
Akin, Gump, Strauss, Hauer & Feld
Los Angeles, CA  90067

Patricia A. Millett  (Argued)
Akin, Gump, Strauss, Hauer & Feld
Washington, DC  20036

Mark D. Collins
Christoper M. Samis
Richards, Layton & Finger
Wilmington, DE  19899

       Attorneys for Appellee  Official Comm.
       Of Unsecured Creditors

—————————

OPINION OF THE COURT

—————————


SLOVITER, *Circuit Judge*.

The bankruptcy proceeding that is the subject of this appeal is one of three matters pending in three jurisdictions. We are advised by the parties that the amount ultimately at issue is between 8 or 9 billion dollars. The specific issue before us is the interpretation of the police power exception to the automatic stay contained in 11 U.S.C. § 362(b)(4). The Bankruptcy Court, affirmed by the District Court, held that the automatic stay applies to appellants who have interposed various arguments in their effort to overturn that holding. Those efforts are unsuccessful and we will affirm.

The Trustee of Nortel Networks U.K. Pension Plan ("Trustee") and the U.K. Board of the Pension Protection Fund ("PPF") (collectively "Appellants") appeal from the District Court order affirming the decision of the Bankruptcy Court to enforce the automatic stay against Appellants with respect to their participation in U.K. pension proceedings. Appellants argue that the U.K. pension proceedings, which were initiated by the U.K. Pensions Regulator ("TPR" or "the Regulator"),[1] fall within the police power exception to the automatic stay, 11 U.S.C. § 362(b)(4), which allows "a governmental unit" to bring or continue actions against a debtor to prevent or stop violations of law affecting matters of public health, safety, or welfare. The Debtors, including

—————————————

[1] The U.K. Pensions Regulator is "a regulatory entity created by the U.K. Pensions Act 2004 to protect the benefits of members of work-based pension schemes." *In re Sea Containers, Ltd.*, No. 06-11156 (KJC), 2008 WL 4296562, at *2 (Bankr. D. Del. Sept. 19, 2008); *see also* U.K. Pensions Act, 2004, c. 35, § 1.

3

U.S.-based Nortel Networks, Inc. ("NNI") and NN Caribbean and Latin American ("NN CALA"), together with the Committee of Unsecured Creditors of NNI ("Committee") (collectively "Appellees") argue that the police power exception does not apply because the Trustee and PPF are private parties and not "governmental units" as defined in the Bankruptcy Code, and the purpose of the U.K. proceedings is to address private pecuniary interests rather than a matter of public concern. This appeal requires us to decide whether the police power exception under § 362(b)(4) applies to Appellants' participation in the U.K. proceedings.

## I.

### Background

The Nortel Group ("Nortel Group" or "Nortel"), founded in 1895 as Bell Telephone Company of Canada, was a global supplier of telecommunications and computer networking solutions. Nortel's global revenue for the 2007 calendar year was approximately $11 billion, of which 25% was generated by the Europe, Middle East and Africa ("EMEA") region. As of 2009, the Nortel Group employed approximately 24,000 people worldwide. However, due to changes in the industry, Nortel's rising pension obligations, and the general downturn in the global economy, Nortel "faced a deterioration of cash and liquidity" and "concluded that a comprehensive financial and business restructuring could be most effectively and quickly achieved within the framework of creditor protection proceedings in multiple jurisdictions." J.A. at 329.

In early 2009, the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States District Court for the District of Delaware and the Committee of Unsecured Creditors was then formed. Concurrently, Nortel Networks Corporation ("NNC")—Nortel Group's ultimate holding company listed on the Toronto Stock Exchange—and other Canadian affiliates entered insolvency proceedings in Canada. In addition, the

4

High Court of Justice in England placed Nortel Networks U.K. Limited ("NNUK") and other European Nortel entities into administration.[2] The Bankruptcy Court recognized the Canadian and U.K. proceedings as "foreign main" proceedings under Chapter 15 of the Bankruptcy Code, which triggered the automatic stay of 11 U.S.C. § 362(a). 11 U.S.C. §§ 1502(4), 1517(b)(1), 1520(a)(1).

Later, in June 2009, Nortel entities from the United States, Canada and the EMEA region entered into the Interim Funding and Settlement Agreement ("IFSA"), which was approved by the Bankruptcy Court. The IFSA provides for the parties' cooperation in the global sales of Nortel's business units and agreement that the proceeds of any sale will be held in escrow until the parties either reach a consensual allocation or obtain a binding procedure for the allocation pursuant to an agreed upon protocol.

In an opinion entered February 17, 2011, the Canadian trial court noted that "Nortel has sold substantially all of its operating businesses in the course of insolvency proceedings in Canada, England and the United States," and "[t]he proceeds are being held in escrow pending determination of how they are to be allocated among the various Nortel Companies." *In re Nortel Networks Corp.*, 2011 CarswellOnt 1074, ¶ (Can. Ont. Sup. Ct. J.) (WL). At oral argument before us, the parties explained that the proceeds, which total upwards of $8 billion, are being held in escrow in New York subject to the jurisdiction of the courts in Canada and the United States.

In September 2009, the Trustee and PPF timely filed joint claims against the U.S. Nortel entities in the Bankruptcy

---

[2] Under U.K. law, the court appoints a person ("the administrator") to manage "the affairs, business and property of the company" during the period that the company is in administration. One of the purposes of an administration order may be "the survival of the company . . . as a going concern[.]" Insolvency Act, 1986, c. 45, § 8(2)-(3) (U.K.).

Court. Those claims allege that the NNUK pension plan is underfunded by an estimated $3.1 billion (or £2.1 billion), and that TPR may seek to require certain of the U.S. Debtors, including NNI and NN CALA, to provide financial support for the NNUK plan under the U.K. Pensions Act 2004. Appellants' claims in the U.S. bankruptcy proceedings were filed as contingent and unliquidated because they are predicated on the outcome of the U.K. proceedings. As counsel for the U.S. Debtors stated, Appellants' claims are "among the largest, if not the largest, claims filed in [the U.S. bankruptcy proceedings]." J.A. at 615-16.

The U.K. regulatory proceedings are to determine the extent of the liability of NNUK affiliates for the deficit because NNUK's pension plan is a defined benefit pension scheme established under and governed by U.K. law. As explained by the U.S. Debtor's expert Richard Hitchcock, in defined benefit plans, "it is not until a member comes to retire that the true extent of his or her pension entitlement [based in this case on final salary] can be known[. Thus,] funding on an ongoing basis is always a matter of estimation." J.A. at 71. In February 2010, NNUK's plan had over 40,000 members including those not yet in retirement.

With respect to Appellants' roles in the U.K. proceedings under U.K. law, the PPF is a government-created but privately funded entity that provides payments to members of defined benefit pension plans whose employers cannot fully fund their pension obligations. In other words, the PPF acts as a "safety net." J.A. at 72-73, 400.

Appellants' expert Richard Favier stated that after receiving notice that NNUK was placed into administration, PPF entered an "assessment period" during which PPF "assess[es] whether it is required under the relevant statutory provisions to take responsibility to pay members' benefits," and "tr[ies] to ensure that the scheme recovers all debts due to it." J.A. at 402. The U.S. Debtor's expert Hitchcock explained that the Trustee is a private party responsible for administering the plan and ensuring that members receive

6

their benefits. It "retain[s] responsibility for paying benefits, during the assessment period." J.A. at 73. However, its "rights and powers . . . in relation to any debt . . . due to [it] by the employer. . . are exercisable by the Board [of the PPF] to the exclusion of the trustees or managers." U.K. Pensions Act, 2004, c. 35, § 137(2). PPF is still in an assessment period with respect to NNUK's plan and has not yet stepped in to pay benefits to NNUK plan members.

TPR was established under the U.K. Pensions Act 2004 as the U.K. governmental agency charged with regulating occupational pension schemes in the U.K., such as NNUK's plan. The objectives of TPR as originally stated under the Act are: "(a) to protect the benefits under occupational pension schemes of, or in respect of, members of such schemes, (b) to protect the benefits under personal pension schemes of, or in respect of, members of such schemes . . ., (c) to reduce the risk of situations arising which may lead to compensation being payable from the Pension Protection Fund . . ., and (d) to promote, and to improve understanding of, the good administration of work-based pension schemes."[3] U.K. Pensions Act, 2004, c. 35, § 5(1). TPR is not a party to the instant lawsuit and has not sought to intervene.[4]

The UK Pensions Act provides that to meet its objectives, TPR "may determine whether or not to take regulatory action, which includes, *inter alia*, determining whether the applicable pension is underfunded, quantifying the deficit and holding the employer or a related party responsible for such deficit." *In re Nortel Networks Corp.*,

---

[3] The U.K. Pensions Act of 2008 added to TPR's stated objectives by inserting "(ca) to maximise compliance with the duties under Chapter 1 of Part 1 (and the safeguards in sections 50 and 54) of the Pensions Act 2008…." U.K. Pensions Act, 2008, c. 30, § 65.

[4] TPR is a party to the proceedings in Canada.

7

2010 CarswellOnt 1597, ¶ 7 (Can. Ont. Sup. Ct. J.) (WL) (citing U.K. Pensions Act, 2004, c. 35, § 96). The Determinations Panel ("DP") is an internal group of TPR that "determines whether the regulatory functions should be exercised." *Id.* In this case, TPR concluded that NNUK was "insufficiently resourced" on June 30, 2008.[5] Thus, grounds existed for TPR to institute administrative proceedings under the U.K. Pensions Act 2004 to recover the underfunding from NNUK and its affiliates.

Thereafter, in August and September 2009, TPR advised NNUK and other Nortel entities that it was considering issuing a warning notice, which is a mandatory step towards issuing a Financial Support Direction ("FSD"). A warning notice sets out the grounds for the potential issuance of an FSD, which is a direction requiring the target entity to put financial support in place for an underfunded pension scheme. *See* U.K. Pensions Act, 2004, c. 35, § 43(3). Any company that is an associate of or is otherwise connected with a U.K. pension fund employer may be issued an FSD. *See* U.K. Pensions Act, 2004, c. 35, § 43(6).

In January 2010, TPR issued a warning notice to NNC, NNI, NN CALA, and twenty-six other companies in the Nortel Group. The notice informed the target companies that they had until March 1, 2010 to make submissions to TPR under the U.K. Pensions Act. Under the U.K. Pensions Act, the decision to issue an FSD must occur within two years after the "relevant time" commences. In this case, TPR has determined that the time commenced when it determined that the fund was insufficiently resourced on June 30, 2008, such that the decision to issue an FSD had to be made by June 30, 2010.

On February 18, 2010, the U.S. Debtors filed a Motion for Entry of an Order Enforcing the Automatic Stay Against

---

[5] The U.S. Debtors did not file their Chapter 11 petition until January 14, 2009. (Bankr. Ct. Dist. Del., Case No. 09-10138-KG, ECF No. 1).

Certain Claimants With Respect to the U.K. Pension Proceedings pursuant to 11 U.S.C. § 362(a)(1) and (a)(6). Essentially, the Debtors asked the Bankruptcy Court to enforce the automatic stay to prevent Appellants from participating in the U.K. proceedings with respect to U.S. Debtors' liability for NNUK's plan deficit.

On February 26, 2010, the Bankruptcy Court conducted an evidentiary hearing on the motion, at which the parties presented testimony from expert witnesses and made arguments. The Debtors submitted the expert testimony of Richard Hitchcock, an English pension lawyer describing the relevant statutory regime, the powers of TPR, and who benefits from TPR's exercise of its power, as well as John Ray, the Principal Officer to Debtors appointed by the Bankruptcy Court, opining that enforcement of the stay is needed because the allocation issue to be determined in the U.K. proceedings overlaps with the issue before the Bankruptcy Court. Appellants submitted expert testimony of David Wyndham Davies, Chairman of the Board of NNUK Pension Trust, opining that the Determinations Panel is the best forum for resolving U.K. regulatory procedure, Richard Favier, Senior Insolvency Advisor to PPF, describing the role of PPF and importance of Appellants' participation in the U.K. proceedings, and Robert Wallace Ham, an English pension lawyer, explaining the law and practice related to FSDs.

After the hearing, the Bankruptcy Court issued an Order Enforcing the Automatic Stay Against Certain Claimants with Respect to the U.K. Pensions Proceedings prohibiting Appellants from participating in the U.K. proceedings as to U.S. Debtors NNI and NN CALA. The automatic stay order provides: "The automatic stay imposed by Section 362 . . . is hereby enforced as to the . . . Trustee and the PPF and is fully applicable to the U.K. Pension Proceedings with respect to the Debtors . . . and with respect to the Debtors such Proceedings are deemed void and of no force or effect; to the extent that either . . . the . . . Trustee or the PPF participate in the U.K. Pension Proceedings as to any Debtors, such participation will be in violation of the

automatic stay and subject . . . to sanctions under Section 362." J.A. at 30.

On March 9, 2010, the Bankruptcy Court issued a written memorandum opinion setting forth its reasoning for the stay order. *See In re Nortel Networks Corp.*, 426 B.R. 84 (Bankr. D. Del. 2010). The Court concluded that the police power exception to the automatic stay does not apply because (1) neither the Trustee nor PPF is a "governmental unit" as defined in 11 U.S.C. § 101(27); and (2) narrowly construing the police power exception, the U.K. proceedings do not pass the public policy or pecuniary purpose tests because "the focus of the U.K. Proceedings is to procure a pecuniary benefit[ ] for a private party — the Trustee. . . . [U]nder the U.K. Pensions Act . . . if necessary, the TPR will attempt to impose and liquidate an enforceable debt, to be enforced by or on behalf of the Trustee, for an amount to be paid to the Trustee." J.A. at 48. Having decided the issue before it, the Court then opined on prejudice: "The question of whether and to what extent affiliates of NNUK should be responsible for NNUK's obligations is part and parcel of the entire cross-affiliate benefit and contribution issue and the allocation process. . . . [T]hese issues . . . should not be decided, even in part, by an administrative body [referring to TPR] in a single jurisdiction with a single constituency." J.A. at 52.

Similar to the U.S. Debtors, the court-appointed monitor for the Canadian debtors filed a motion in Canada seeking a stay of the U.K. proceedings. On the same day the Bankruptcy Court issued its stay order in the instant case, the Ontario Superior Court of Justice granted the monitor's motion and held that "for the purposes of the [Canadian insolvency] proceedings, the actions taken by The [U.K.] Pensions Regulator, are null and void in Canada and are to be given no force or effect." J.A. at 780; s*ee also In re Nortel Networks Corp.*, 2010 CarswellOnt 1597, ¶ 1(d) (Can. Ont. Sup. Ct. J.) (WL). TPR appeared in the Canadian proceedings and pursued relief from the stay, but it has not participated in the U.S. proceedings.

10

The Court of Appeal for Ontario dismissed TPR's appeal of the stay order on the merits and held that "the service of the Warning Notice [by TPR] breached the stay provisions in the [Superior Court's] Initial Order. The service of the Notice is, therefore, a nullity for purposes of the [Canadian insolvency] proceedings." *In re Nortel Networks Corp.*, 2010 CarswellOnt 4112, ¶ 1(Can. Ont. C.A.) (per curiam) (WL). The Supreme Court of Canada summarily denied appeal. *See U.K. Pensions Regulator v. Nortel Networks Corp. et al.*, 2011 CarswellOnt 303 (S.C.C.) (per curiam) (WL). Appellants, who are also parties to the litigation in Canada, subsequently moved to lift the stay in Canada to permit them to participate in the U.K. proceedings with respect to the Canadian debtors. At oral argument before this court, the parties stated that Justice Winkler (the Ontario Chief Justice) will oversee mediation proceedings beginning in November, which will focus on the allocation of Nortel's assets. We consider that statement and forthcoming proceeding of extreme significance.

While the appeal of the Bankruptcy Court's stay order was pending before the District Court, the Determinations Panel held a hearing in the U.K. to decide whether to issue an FSD. NNI and NN CALA forfeited their statutory rights to participate and instead complied with the stay order. According to TPR, the Trustee participated in the proceedings by providing witness statements, expert reports and documentary evidence, but only with respect to TPR's request for an FSD against Nortel entities that are not subject to the stay order. *See* Reasons of the Determinations Panel of the Pensions Regulator, Case Ref. TM6409, ¶¶ 6, 14 (Jun. 25, 2010), *available at* www.thepensionsregulator.gov.uk/docs/DN1709618.pdf [hereinafter cited as "Reasons of the Determinations Panel"].

On June 25, 2010, TPR issued a determination notice directing that FSDs be issued against twenty-five Nortel entities after periods for appeal lapsed. *See* Determinations Panel, Determination Notice, Case Ref. TM6409 (Jun. 25, 2010), *available at*

11

http://www.thepensionsregulator.gov.uk/docs/DN1694856.pdf. In its separately filed statement of reasons, the DP stated that even though the Canadian and American Nortel entities did not participate, "much of the evidence and representations which have been submitted to [TPR] are based on the Group's own documentation in submissions to the regulatory or tax authorities or on documentation submitted by representatives for the individual companies to the UK or North American courts in insolvency proceedings." Reasons of the Determinations Panel at ¶ 19. The Determinations Panel concluded that it was reasonable to issue FSDs against NNUK's affiliates because the Nortel Group operated as a "single global entity," and the U.S. entities "benefited indirectly . . . as a result of [the] failure adequately to repair the Scheme's deficit." *Id*. at ¶¶ 91, 108.

After briefing in the U.S. District Court, the Magistrate Judge issued a report and recommendation ("R&R"), recommending that the automatic stay order be affirmed in all respects because "(1) the police power exception is to be narrowly construed; (2) the [U.K.] Proceedings do not pass the pecuniary purpose or public policy test which would exempt them from the stay; and (3) the Bankruptcy Court did not impermissibly base its decision on the issue of prejudice." J.A. at 18. Appellants filed objections, arguing that the Magistrate Judge erroneously applied an abuse of discretion standard of review, read the statute too narrowly, incorrectly determined the exception did not apply, and incorrectly concluded that the Bankruptcy Court did not err by discussing prejudice.

On March 29, 2011, the District Court issued an order adopting the R&R and affirming the Bankruptcy Court's automatic stay order. The Court stated: "Reviewing the R&R, *de novo*, with respect to the objections lodged, the Court concludes that [the Magistrate] Judge . . . did not err in her conclusions with respect to the Bankruptcy Court's findings of fact and its legal determinations." J.A. at 8-9.

12

The Trustee and PPF timely appealed. Appellants filed a motion to expedite their appeal, and this court granted the motion in a summary order.

On April 1, 2011, the DP issued FSDs against several Nortel entities including NNI and NN CALA. Thus, under U.K. law, the Nortel entities had six months—until October 1, 2011—to secure financial support for NNUK's plan. That time has passed and, inasmuch as it appears the Nortel entities failed to appear and to secure financial support for NNUK's plan, the DP has the authority to issue a Contribution Notice ("CN") against them. A CN "state[es] that the [entity] is under a liability to pay to the trustees . . . the sum specified in the notice," which can be either all or some of the plan deficit. J.A. at 99, 101. Under U.K. law, "[t]he sum specified in the [contribution] notice is to be treated as a debt due from the [entity] to the trustees or managers of the scheme." U.K. Pensions Act, 2004, c. 35, § 49(3). That law provides that the DP should issue such a notice only if it is reasonable to do so and upon consideration of several criteria set forth in the Pensions Act, which are similar to those considered in connection with issuance of an FSD. Despite this similarity, the Appellees emphasize that a CN cannot be issued until the TPR determines the financial situation of the relevant entities. *See* U.K. Pensions Act, 2008, c. 35, § 38(7).

Appellants nevertheless insist that they are not attempting to enforce collection of debt outside of the U.S. bankruptcy proceedings. Instead, they assert that the FSD process will help quantify the liability of NNUK affiliates under the U.K. Pensions Act for the benefit of the Bankruptcy Court. Indeed, after receiving word of the U.S. Debtors' motion to enforce the automatic stay, TPR wrote a letter to the Debtors' U.K. counsel stating: "It is crucial to note that an FSD is not a claim against assets of a party, and the Regulator[6] is not engaged in a process of enforcement or of seeking priority for claims lodged in the Chapter 11 proceedings. An FSD may result in the agreement of a party

---

   [6] *See supra* note 1.

13

to offer financial support, or the issue by the DP of a contribution notice . . . which is treated as a debt due . . . ." J.A. at 394. The letter continued: "It is not a process that targets assets but will allow the debt due to the <u>Trustees</u> of the NNUK pension scheme from parties such as the Debtors to be ascertained and quantified." J.A. at 396 (emphasis in original).

Appellees counter that they believe Appellants will use the FSD and CN to their advantage and seize assets, which will put Appellants in a better position than other creditors. As the Bankruptcy Court stated, "[w]hat we have here are creditors who have filed claims in this Court and who are seeking to litigate those claims clear of the Court's jurisdiction and the automatic stay. Their effort to do so is inimical to the Debtors' effort and those of non-U.S. debtors in a highly complex liquidation to assemble the assets, reduce them to money, allocate those assets among numerous entities in many countries and then distribute the assets." J.A. at 46-47. Appellees also point out that the Bankruptcy Court is capable of quantifying the liability under U.K. law, as required, within the context of the allocation proceedings. As such, Appellees object not only to the collection of assets in the U.K. outside of the allocation process but also the assessment and quantification of the liability in the U.K. even if only used as a guide for the Bankruptcy Court.[7]

## II.

_____

[7] The Canadian court noted that the majority of Nortel's creditors are individual unsecured creditors, such as employees and former employees with claims for pension and medical benefits. "For many of these individuals, the delay in receiving a meaningful distribution can be significant . . . . For this group of creditors, time is not on their side. . . . [Whereas,] the timing of a receipt of a distribution may be less critical for a financial player . . . ." *See In re Nortel Networks Corp.*, 2011 CarswellOnt 5740, ¶¶ 12, 14 (Can. Ont. Sup. Ct. J.) (WL).

14

**Standard of Review**

This court has jurisdiction under 28 U.S.C. § 158(d)(1). We exercise plenary review of an order from a district court sitting as an appellate court in review of a bankruptcy court and we will review both courts' legal conclusions de novo.[8] We review a bankruptcy court's factual findings for clear error. We engage in a mixed standard of review for mixed questions of law and fact, and apply a clearly erroneous standard to "integral facts," but exercise plenary review of the court's interpretation and application of those facts to legal precepts. *In re Exide Techs.*, 607 F.3d 957, 961-62 (3d Cir. 2010).

"This issue requires us to interpret and apply the legal precepts underlying section 362. Accordingly, the standard of review is plenary." *Mar. Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1203 (3d Cir. 1991) (citation omitted). To the extent that we consider the decisions of the bankruptcy court and district court regarding comity, we review for abuse of discretion. *Remington Rand Corp.-Del. v. Bus. Sys., Inc.*, 830 F.2d 1260, 1266 (3d Cir. 1987).

**III.**

---

[8] "Because the District Court sat below as an appellate court, this Court conducts the same review of the Bankruptcy Court's order as did the District Court." *In re Telegroup, Inc.*, 281 F.3d 133, 136 (3d Cir. 2002) (citation omitted). Accordingly, even if we were to accept Appellants' argument that the Magistrate Judge and District Court "gave unwarranted deference to the Bankruptcy Court's erroneous conclusions of law," *see* Appellants' Br. at 52, the result of this appeal would be the same. Similarly, we need not evaluate Appellants' argument that the Bankruptcy Court improperly considered prejudice when deciding whether the U.K. proceedings fit within the police power exception because we have exercised plenary review over this legal issue and accordingly have not considered prejudice.

## Analysis

When a debtor files for bankruptcy, Section 362(a) of the Bankruptcy Code imposes a broad automatic stay. That stay prohibits "all entities" from, *inter alia*, "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1), (6). The automatic stay provides one of the fundamental protections for debtors found in the Bankruptcy Code. *See, e.g.*, *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 (1986).

Congress, however, has created certain statutory exceptions that prevent the operation of the automatic stay. The police power exception at issue in this case allows for "the commencement or continuation of an action or proceeding by a governmental unit or any organization exercising authority . . . to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power." 11 U.S.C. § 362(b)(4). "This exception discourages debtors from submitting bankruptcy petitions either primarily or solely for the purpose of evading impending governmental efforts to invoke the governmental police powers to enjoin or deter ongoing debtor conduct which would seriously threaten the public safety and welfare (*e.g.*, environmental and/or consumer protection regulations)." *In re McMullen*, 386 F.3d 320, 324-25 (1st Cir. 2004) (citing *In re First Alliance Mortg. Co.*, 263 B.R. 99, 107 (B.A.P. 9th Cir. 2001) (noting that fundamental policy of § 362(b)(4) is to "prevent[ ] the bankruptcy court from becoming a haven for wrongdoers") (internal quotation marks and citation omitted)); *see also United States v. Nicolet, Inc.*,

16

857 F.2d 202, 207 (3d Cir. 1988) ("To combat the risk that the bankruptcy court would become a sanctuary for environmental wrongdoers, among others, Congress enacted the police and regulatory power exception to the automatic stay.").

The parties do not challenge the extraterritorial application of the automatic stay to the U.K. proceedings.[9] *See* David P. Stromes, Note, *The Extraterritorial Reach of the Bankruptcy Code's Automatic Stay: Theory vs. Practice*, 33 BROOK J. INT'L. L. 277, 281 (2007) ("Since 1987, United States courts have uniformly upheld the extraterritorial application of the automatic stay."). In the absence of an exception, the plain language of the automatic stay covers Appellants' participation in the U.K. proceedings because the U.K. proceedings are an attempt to "assess" a claim against the Debtors that arose pre-petition.[10]

The exception on which Appellants rely for their contention that the automatic stay does not preclude their participation in the U.K. proceedings is the police power exception as set forth in § 362(b)(4). Application of that exception requires us to determine in the first instance whether the U.K. proceeding is a "proceeding by a governmental unit" and, necessarily, which entity, if any, is the relevant "governmental unit." 11 U.S.C. § 362(b)(4).

### A. Governmental Unit

The police power exception to the automatic stay applies to "the commencement or continuation of an action or

------

[9] Appellants' Br. 23 n.14; Debtors' Br. 24 n.17.

[10] Appellants insist that they are not seeking to "recover" anything in the U.K. proceedings. As they state in their Reply Brief, "each of the Trustee and PPF has expressly represented to the Bankruptcy Court that it will make no effort to enforce that debt outside the Bankruptcy Court's claims allowance process." Reply Br. at 24.

proceeding" taken by a "governmental unit . . . to enforce such governmental unit's . . . police and regulatory power." 11 U.S.C. § 362(b)(4). We must first determine which entity is the relevant governmental unit in the U.K proceedings.

As we set forth at the outset, the two Appellants are the Trustee and PPF. The Bankruptcy Court held that neither Appellant is a governmental unit as defined under the Code. Under the Bankruptcy Code, "[t]he term 'governmental unit' means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States (but not a United States trustee while serving as a trustee in a case under this title), a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government." 11 U.S.C. § 101(27). The legislative history of § 101(27) instructs that "'[d]epartment, agency, or instrumentality' does not include entities that owe their existence to state action such as the granting of a charter or a license but that have no other connection with a State or local government or the Federal Government. The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function." *In re Wade*, 948 F.2d 1122, 1123 (9th Cir. 1991) (quoting H.R. Rep. No. 95-595 (1977)).

We see no basis to disagree with the Bankruptcy Court's conclusion that neither the Trustee nor PPF is a "governmental unit" within the scope of the police power exception. Under U.K. law, the Trustee is a private party responsible for administering the plan and ensuring that members receive their benefits; the PPF is a government-created but privately funded entity that acts as a "safety net" by providing payments to members of defined benefit pension plans whose employers cannot fully fund their pension obligations. J.A. at 72-73, 400. Even though PPF "owe[s] its existence" to the U.K. Pensions Act, the relationship is not "active" during the assessment period because PPF is standing in the shoes of a private party. Accordingly, neither the Trustee nor PPF is a governmental unit during the

18

assessment period for the purposes of the police power exception.

The Bankruptcy Court proceeded to analyze the applicability of the police power exception using TPR as the relevant governmental unit. In the only case cited by the parties that addressed whether the U.K. regulatory procedure initiated by TPR violates the automatic stay, a bankruptcy court in Delaware also concluded that TPR was the relevant governmental unit. *See In re Sea Containers Ltd.*, No. 06-11156, 2008 WL 4296562, at *9 (Bankr. D. Del. Sept. 19, 2008) (approving a Settlement Agreement).

It is TPR that has been fulfilling its statutory objectives "to protect the benefits of members of occupational pension schemes" and "to reduce the risk of situations arising whereby compensation would become payable by the PPF" by initiating the U.K. proceedings, which only TPR had the authority to do. *See* Reasons of the Determinations Panel, *supra* p.13 at ¶ 3. Therefore, it appears that TPR is a governmental unit for the purposes of determining the applicability of the police power exception to the U.K. proceedings. However, TPR is not a party to the pending bankruptcy proceedings. Unlike the Trustee and PPF, it did not file a claim and therefore cannot assert the police power exception.[11]

---

[11] We assume but do not decide that private parties can rely on the police power exception to participate in proceedings to enforce a governmental unit's police and regulatory power when the relevant governmental unit is not a party to the bankruptcy proceedings. *Cf. In re Aerobox Composite Structures, LLC*, No. 11-07-10138, 2008 WL 1733601 (Bankr. D.N.M. Apr. 10, 2008) (holding that an individual who had received notice of the filing of debtor's bankruptcy proceeding was permitted to participate in post-petition proceedings before the human rights commission of the State of New Mexico Department of Labor through the operation of the police power exception).

## B. Pecuniary Purpose and Public Policy Tests

There is yet another obstacle to the Appellants' argument that the proceedings at issue fall within the police power exception to the automatic stay. To make this determination, courts have applied two "related, and somewhat overlapping" tests: the pecuniary purpose test and the public policy test.[12] *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1108 (9th Cir. 2005). The pecuniary purpose test asks whether the government primarily seeks to protect a pecuniary governmental interest in the debtor's property, as opposed to protecting the public safety and health. The public policy test asks whether the government is effectuating public policy rather than adjudicating private rights. If the purpose of the law is to promote public safety and welfare or to effectuate public policy, then the exception to the automatic stay applies. If, on the other hand, the purpose of the law is to protect the government's pecuniary interest in the debtor's property or primarily to adjudicate private rights, then the exception is inapplicable. *See, e.g.*, *Chao*, 270 F.3d at 385. The complementary tests "are designed to sort out cases in which the government is bringing suit in furtherance of *either* its own or certain private parties' interest in obtaining a pecuniary advantage over other creditors." *Id*. at 389.

---

[12] It is unclear whether the government action must meet both tests to fall within the police power exception. *Compare Lockyer*, 398 F.3d at 1108 ("A suit comes within the exception of § 362(b)(4) if it satisfies either test."); Collier on Bankruptcy ¶ 362.05[5][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011) (if action satisfies "either" test "then the exception applies"), *with Chao v. Hosp. Servs., Inc.*, 270 F.3d 374, 389, 394 (6th Cir. 2001) (finding a suit filed by the Secretary of Labor passed the pecuniary interest test but failed the public policy test, and therefore did not fall within the police power exception). In light of our holding hereafter, we need not decide this issue.

The issue is not new to this court. We have held that regulatory proceedings related to environmental hazards, health and safety violations, and employment discrimination all fall within the police power exception to the automatic stay. *See, e.g.*, *In re Mystic Tank Lines Corp.*, 544 F.3d 524 (3d Cir. 2008) (recognizing that state action to recover the costs of cleanup of contaminated site fall within police power exception); *Brock v. Morysville Body Works, Inc.*, 829 F.2d 383 (3d Cir. 1987) (petition by Secretary of Labor to enforce Occupational Safety and Health Administration citation for violations of safety and health standards); *E.E.O.C. v. Hall's Motor Transit Co.*, 789 F.2d 1011, 1014 (3d Cir. 1986) (employment discrimination action brought by Equal Employment Opportunity Commission). Additionally, this court has concluded that under circumstances involving a question of federal-state preemption arising in a case involving environmental hazards, "the exception to the automatic stay provision contained in subsections 362(b)(4)-(5) should itself be construed broadly, and no unnatural efforts be made to limit its scope." *Penn Terra Ltd. v. Dep't of Envtl. Res.*, 733 F.2d 267, 273 (3d Cir. 1984).

The U.K. proceedings in this case do not relate to public health or safety, and the issue of federal state preemption is not present here. Therefore, the reasons for our earlier statement in *Penn Terra* that the police power exception to the automatic stay should be construed broadly are not applicable here.[13]

---

[13] In fact, the legislative history expressly supports a narrow construction of the police power exception. In *Penn Terra* we quoted the statements of

Rep. Don Edwards, Chairman of the
Subcommittee on Civil and Constitutional
Rights of the House Judiciary Committee, and
Senator Dennis DeConcini, Chairman of the
Subcommittee on Improvements in the Judicial
Machinery of the Senate Judiciary Committee
[who] remarked during the debates on the

Instead of making a broad generally applicable pronouncement as to how the police power exception should be interpreted, we must look to the purpose of the proceeding at issue. In *Penn Terra*, the environmental purpose behind the proceedings at issue fell "squarely within Pennsylvania's police and regulatory powers." *Id.* at 274 ("No more obvious exercise of the State's power to protect the health, safety, and welfare of the public can be imagined."). Moreover, in that case we were focused on the unique concerns involving federal-state preemption.[14] We supported our decision by

> Bankruptcy Reform Act that "This section [§ 362(b)(4)] is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in the property of the debtor or property of the estate."

*Penn Terra*, 733 F.2d at 274 n.6 (quoting 1978 U.S. Code Cong. & Ad. News at 6444-45 (remarks of Rep. Edwards); 1978 U.S. Code Cong. & Ad. News at 6513 (remarks of Sen. DeConcini)).

[14] Appellants argue that the concerns relating to federal-state preemption present in *Penn Terra* "apply with equal, if not greater, force where a foreign sovereign's interests are implicated." Appellants' Br. at 22. Principles of comity do not require us to construe the police power exception as applying more broadly for foreign proceedings than for domestic proceedings. The Bankruptcy Court did not abuse its discretion in its consideration of comity while determining that the U.K. proceedings fail both the pecuniary purpose test and public policy test. On the other hand, we do not adopt the Magistrate Judge's assertion that "the police powers exception should be interpreted narrowly with regard to foreign entities." J.A. at 19. The plain language of the Bankruptcy Code defining "governmental unit" as including

noting the bankruptcy court's ability to enjoin State proceedings under § 105 should it be necessary to effectuate federal bankruptcy policy. A bankruptcy court cannot easily enjoin foreign proceedings under § 105. Therefore, the reasoning from *Penn Terra* cautions against a broad reading of the exception under the circumstances of this case.

Like the environmental purpose in *Penn Terra*, the purposes behind the proceedings in *Morysville Body Works* and *Hall's Motor Transit Co.* also fit squarely within the goals intended to be covered by the police power exception. According to the legislative history, § 362(b)(4) "excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay." S. Rep. No. 95-989 at 49 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5838.

By contrast, the U.K. proceedings in this case do not fit within this expressed purpose because they are not predicated upon any allegation of wrongdoing on the part of Nortel.[15] Although a close question, we therefore agree with

"a foreign state, or other foreign or domestic government," 11 U.S.C. § 101(27), provides no justification for drawing any distinction between a foreign and domestic state in the application of the police power exception. We note that the U.K. proceedings have continued without the participation of the parties in this case, and Appellants remain free to file a motion for relief from the stay for cause.

[15] Allegations of wrongdoing are not a prerequisite to a determination that a particular action or proceeding effectuates public policy. Indeed, the absence of wrongdoing is not dispositive here.

23

the Bankruptcy Court's conclusion that the U.K. proceedings fail both the pecuniary purpose test and the public policy test. Through these proceedings, TPR is primarily seeking to determine the liability for a financial shortfall in a private pension plan. This purpose does not protect the public safety and health as those terms have been applied in the context of the police power exception.[16] Appellants argue that the U.K. proceedings advance a public policy because they "encourage

---

[16]Appellants argue that the U.K. Proceedings are similar to actions taken by the Pension Benefit Guaranty Corporation (PBGC) that have been held to fall within the police power exception. *See, e.g.*, *Pension Benefit Guar. Corp. v. LTV Corp. (In re Chateaugay Corp.)*, 87 B.R. 779, 806 (S.D.N.Y. 1988) (section 362(b)(4) exception applies to imposition of funding liability following restoration of plan by PBGC), *aff'd*, 875 F.2d 1008 (2d Cir. 1989), *rev'd on other grounds*, 496 U.S. 633 (1990). Appellants emphasize the similarities between the entities established by the U.K. Pensions Act 2004 and the PBGC. Without deciding whether certain actions of the PBGC fall within the police power exception, we note that there are also significant differences between these systems. The U.K. Pension Act 2004 has divided the roles that the PBGC takes on in the U.S. system between multiple entities such that the TPR, DP, and PPF each have distinct roles in the U.K. system, with distinct goals. In the U.K. proceedings here, TPR's primary goal is to determine whom to hold liable for the deficiency in NNUK's pension scheme. Even assuming that the broader goal of protecting pension plans in the U.K. protects the public welfare within the meaning of the exception, the specific goal of the U.K. proceedings here is too far removed from that purpose for them to fall within the police power exception. Notably, even the PBGC is subject to the force of the automatic stay under some circumstances. *See, e.g.*, *Pension Benefit Guar. Corp. v. Belfance (In re CSC Indus., Inc.)*, 232 F.3d 505 (6th Cir. 2000) (holding that the PBGC's claim for missed minimum funding contributions was not entitled to a tax priority in the bankruptcy context because a lien could not be imposed due to operation of automatic stay).

24

the proper funding and administration of pension schemes and also serve to deter the 'moral hazard' created when employers and their affiliates evade pension obligations and pass off the burden of pension liabilities to the PPF." Appellants' Br. at 32. The passage of the U.K. Pensions Act 2004 and the system established by the Act clearly reflect public policy decisions. It does not follow, however, that the purpose of the particular U.K. proceedings at issue here is to protect the public. Rather, these particular proceedings are focused on the pecuniary interests of the PPF and the members of NNUK's pension scheme.

This conclusion is reinforced by the fact that TPR is primarily adjudicating private rights through these proceedings. Indeed, the U.K. Pensions Act 2004 expressly states that the "main objectives of [TPR] in exercising its [regulatory] functions" include "to protect the benefits under occupational pension schemes of, or in respect of, members of such schemes" and "to reduce the risk of situations arising which may lead to compensation being payable from the Pension Protection Fund . . . ." U.K. Pensions Act, 2004, c. 35, §5(1). The English High Court of Justice Chancery Division has also recognized that "[i]n essence, [TPR's] function is to protect members of occupational and personal pension schemes, and to reduce the risk of claims being made on the PPF." *Indep. Tr. Servs. Ltd. v. Hope & Others*, [2009] EWHC (Ch) 2810, [10], 2009 WL 3643864 (U.K. Ch. Nov. 10, 2009).

Because the Appellants have not shown that they fall within the police power exception to the automatic stay, we affirm the decision of the District Court that affirmed the decision of the Bankruptcy Court enforcing the automatic stay.

## IV.

## Additional Comments

25

Although our judgment affirming the decision of the District Court and approving that of the Bankruptcy Court is dispositive of the appeal before us, we nonetheless consider the additional arguments made by the parties in the hope it will resolve some of the remaining matters. The Appellants argue that "the lower courts erroneously concluded that the regulatory power exception does not apply to the U.K. regulatory procedure," Appellants' Reply Br. at 6, and they rely on what they characterize as "principles of international comity" in support of their argument. As we discussed above, neither the Trustee nor PPF is a "governmental unit" within the scope of the police power exception. The issue of the application of the automatic stay with respect to proceedings pending in foreign tribunals has been the subject of some academic discussion, *see, e.g.* Stromes, *supra* page 19, at 380-83, and we see no need to add to that body of writing.

Appellants challenge the paragraph of the Bankruptcy Court's order stating that the automatic stay imposed by § 362 is enforced as to the U.K. Pension Trustee and the PPF "and is fully applicable to the U.K. Pension Proceedings" and "with respect to the Debtors such Proceedings are deemed void and of no force or effect; to the extent that either of the U.K. Pension Trustee or the PPF participate in the U.K. Pension Proceedings as to any Debtors such participation will be in violation of the automatic stay and subject the participating persons or entities to sanctions under Section 362." J. A. at 30. These statements are no more than required by the language and scope of the automatic stay. Once the Appellants subjected themselves to the jurisdiction of the Bankruptcy Courts by filing their claims, they became subject to the provisions of the automatic stay.

Of course, there is nothing now before the Bankruptcy Court that requires it to determine what effect, if any, it should accord to the estimate adopted by TPR quantifying the claim emanating from the U.K. regulatory procedure to $3.1 billion. We are not even at the stage at which the Bankruptcy Court must decide the admissibility of the findings emanating

from the U.K. proceedings. One factor to be considered by the Bankruptcy Court if and when there is an attempt to introduce those findings into evidence at a hearing is that none of the parties before the Bankruptcy Court participated in the U.K. proceedings with respect to the U.S. parties.[17]

In summary, the situation before the various courts and tribunals is that there are insufficient funds to satisfy the claims of all the creditors. We have seen no estimate as to the total of the claims filed in the United States and Canadian bankruptcies. The issues of the competing claims will be determined in the allocation stage.

We are concerned that the attorneys representing the respective sparring parties may be focusing on some of the technical differences governing bankruptcy in the various jurisdictions without considering that there are real live individuals who will ultimately be affected by the decisions being made in the courtrooms. It appears that the largest claimants are pension funds in the U.K. and the United States, representing pensioners who are undoubtedly dependent, or who will become dependent, on their pensions.[18] They are the Pawns in the moves being made by the Knights and the Rooks.

Mediation, or continuation of whatever mediation is ongoing, by the parties in good faith is needed to resolve the differences. No party will benefit if the parties continue to clash over every statement and over every step in the process.

---

[17] We note that the parties agree that the English Appeal Court's decision issued on October 14, 2011 has no effect on the issues before this court. *See Re Nortel GMBH* [2011] EWCA Civ 1124 ("COA") (holding an FSD or CN issued by TPR to a company in administration ranks as an expense of the administration under English pensions law); *see also* Debtors' Resp. at 2; Creditors' Resp. at 1; Appellants' Resp. at 3.

[18] *See supra* note 7.

This will result in wasteful depletion of the available assets from which each seeks a portion.  There appears to be one constructive solution – the protocol agreed upon by appointing Justice Winkler to resolve the allocation issues. He apparently has the respect of all parties and we hope (although it is not in our power to order) that the parties promptly devise a process by which all conflicting claims are put in his hands for resolution.

For the reasons set forth, we will affirm the order of the District Court.