**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 13-2739

_____

*In re Nortel Networks Inc., et al.,*

*Debtors*

JOINT ADMINISTRATORS FOR NORTEL NETWORKS
UK LIMITED AND CERTAIN OF ITS AFFILIATES
LOCATED IN THE REGION KNOWN AS EMEA,

Appellants

_____

On Appeal from the United States Bankruptcy Court
for the District of Delaware
(Case No. 09-10138)
Bankruptcy Judge: Honorable Kevin Gross

_____

Argued: October 8, 2013

Before: FUENTES, GREENBERG, and BARRY, *Circuit Judges*

(Opinion Filed: December 06, 2013)

Edwin J. Harron
Robert S. Brady
John T. Dorsey
Jaime Luton Chapman
Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801

Derek J.T. Adler [Argued]
Amera Z. Chowhan
Gabrielle Glemann
Charles H. Huberty
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004

*Attorneys for Appellants Joint Administrators for Nortel Networks UK Limited and Certain of its Affiliates Located in the Region Known as EMEA.*

Howard S. Zelbo [Argued]
James L. Bromley
Lisa M. Schweitzer
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006

Derek C. Abbott
Ann C. Cordo
Morris, Nichols, Arsht & Tunnell LLP,
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, Delaware 19801

*Attorneys for Appellees Nortel Networks Inc., et al.*

Fred Hodara
David Botter
Abid Qureshi
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036

Patricia A. Millett [Argued]
Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Ave., N.W.
Suite 400
Washington, D.C. 20036

L. Rachel Lerman
Akin Gump Strauss Hauer & Feld LLP
2029 Century Park East
Suite 2400
Los Angeles, California 90067

*Attorneys for Appellee The Official Committee of Unsecured Creditors of Nortel Networks Inc., et. al.*

_____

OPINION OF THE COURT
_____

FUENTES, Circuit Judge.

After the multinational telecommunications firm Nortel Networks declared bankruptcy in 2009, various debtors comprising the Nortel brand auctioned their business lines and intellectual property. They raised $7.5 billion. Since the auctions, the selling debtors have disputed whether or not they had previously agreed to allocate the auction funds

3

through arbitration. As it stands, the debtors have $7.5 billion and no agreed-upon method for dividing it.

The U.S. Bankruptcy Court for the District of Delaware determined that the parties did not agree to arbitrate their disputes about allocation. Because the contract at the center of this controversy does not reflect the parties' intent to arbitrate disputes about the auction funds, we will not compel the parties to do so. We therefore affirm.

We do not consider the Joint Administrators' related, but distinct, challenge to the Bankruptcy Court's decision to allocate the contested funds. A panel of this Court declined to certify that question for appeal. In any event, the Bankruptcy Court has not yet held the hearing to allocate the funds, so review would be premature.

## I. Background of the Case

### A. *The Facts*

In early 2009, Nortel entities around the world declared bankruptcy and filed petitions in U.S., Canadian, English, and French courts to begin insolvency proceedings. *See In re Nortel Networks, Inc.*, 669 F.3d 128, 130-31 (3d Cir. 2011) (summarizing history of the Nortel bankruptcy). The following day, the U.S. Bankruptcy Court for the District of Delaware and the Superior Court of Ontario, Canada, each approved a cross-border protocol for coordinating U.S. and Canadian proceedings.

As a transnational company with numerous subsidiaries located in multiple jurisdictions, Nortel's insolvency posed challenges of coordination and timing. Among them, multiple Nortel entities owned the business lines and intellectual property that comprised the global Nortel brand. Thus, any

plan to sell or reorganize Nortel property would have to accommodate multiple, and possibly conflicting, interests. At the same time, the value of Nortel's business and intellectual property stood to diminish over time. Therefore, any plan to sell or reorganize Nortel's assets had to be formed quickly in order to maximize Nortel's value. The debtors faced a conflict between their mutual interest in quick sales and their individualized interests in receiving a big share of each sale.

Enter the Interim Funding and Settlement Agreement ("Interim Funding Agreement"). Broadly speaking, the Interim Funding Agreement "provides for the parties' cooperation in the global sales of Nortel's business units and agreement that the proceeds of any sale will be held in escrow until the parties either reach a consensual allocation or obtain a binding procedure for the allocation pursuant to an agreed upon protocol." *Nortel*, 669 F.3d at 131. The agreement thus created a framework for Nortel debtors to sell assets without first agreeing how to allocate the proceeds of any sale among the relevant debtors.

Nortel debtors from the United States, Canada, Europe, the Middle East, and Africa entered into the Interim Funding Agreement on June 9, 2009. The debtors reduced the crux of their sales arrangement to Section 12 of the agreement, captioned "Entry into Sale Transactions." That section outlines a sale and escrow framework:

- Section 12(a) states that sales and auctions "shall not be conditioned upon" an agreement between the sellers to allocate sale proceeds or an agreement on the procedure for allocating sale proceeds. App'x 1560, ¶ 12(a).
- Section 12(b) states that the sale proceeds shall be deposited into escrow and not released "in advance of either (i) agreement of all of the Selling Debtors or (ii) in

5

the case where the Selling Debtors fail to reach agreement, determination by the relevant dispute resolver(s) under the terms of the Protocol (as defined below) applicable to the Sale Proceeds, and subject in each case to payment of the agreed or determined amount of allocation of Sale Proceeds to all Selling Debtors." App'x 1560, ¶ 12(b).

− Section 12(c) states that the parties shall "negotiate in good faith and attempt to reach agreement on a timely basis on a protocol for resolving disputes concerning the allocation of Sale Proceeds." App'x 1560, ¶ 12(c).

− Section 12(d) states that, after a sale, the parties shall "negotiate in good faith and on a timely basis to attempt to reach agreement regarding the allocation of the Sale Proceeds . . . , failing which the Interim Sales Protocol shall apply to determine the allocation of the relevant Sale Proceeds." App'x 1560, ¶ 12(d).

Section 12 does not use the words "arbitrators" or "arbitration," or identify any arbitral association.

Separate from Section 12, the Interim Funding Agreement contains choice-of-law and forum-selection clauses. The parties placed these clauses in Section 16, captioned "Governing Law and Jurisdiction." App'x 1563-64. Section 16(a) specifies that the laws of the State of New York govern the agreement except as to Section 17, which concerns the personal liability of the representatives of the European, Middle Eastern, and African debtors. Section 16(b) states that the parties agree "to the non-exclusive jurisdiction of the US and Canadian Courts (in a joint hearing conducted under the Cross-Border Protocol adopted by such Court, as it may be in effect from time to time), for purposes of all legal proceedings to the extent relating to the matters agreed" in the

6

Interim Funding Agreement. App'x 1564, ¶ 16(b). No part of Section 16 discusses arbitrators, arbitration, or arbitral associations.

The Bankruptcy Court and the Ontario Superior Court held a cross-border hearing on the Interim Funding Agreement on June 29, 2009. Both courts approved the agreement. For its part, the Bankruptcy Court "authorized" the U.S. debtors to "enter into the Interim Funding Agreement pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019." App'x 358, ¶ 2. In its order, the Bankruptcy Court also stated that nothing in the order "shall constitute a Protocol for determining the allocation of proceeds" and that "no proceeds from a Sale Transaction may be allocated . . . unless such allocation is in accordance with a Protocol approved by this Court." App'x 359, ¶ 8. Neither the Bankruptcy Court's nor the Superior Court's order referenced arbitration, arbitrators, or arbitral associations.

After the courts approved the Interim Funding Agreement, Nortel debtors held nine auctions. The auctions raised approximately $7.5 billion in proceeds. As agreed, the debtors placed those proceeds into escrow.

During and after the auctions, the debtors attempted to breathe life into the "Protocol" anticipated by the Interim Funding Agreement. Apparently the parties made substantial progress toward a protocol—even drafting a procedure for a three-person arbitral panel to resolve disputes over proceeds. But despite numerous meetings and multiple rounds of mediation, the parties never executed that draft or any other.

### B. *The Bankruptcy Proceedings*

The failure of the parties to negotiate a protocol left the effort to disburse the escrow funds at a standstill. So the

7

parties took the matter to the courts. The U.S. Nortel debtors ("U.S. debtors") and the U.S. Official Committee of Unsecured Creditors of Nortel Networks Inc. ("U.S. creditors") moved the Bankruptcy Court to decide disputes about asset allocation. The Joint Administrators for the Nortel debtors in the UK proceedings ("Joint Administrators") then cross-moved to compel arbitration on behalf of Nortel debtors located in Europe, Africa, and the Middle East. The U.S. debtors and U.S. creditors (collectively, "U.S. parties") replied that the Interim Funding Agreement—the basis of the Joint Administrators' cross-motion—did not contain an agreement to arbitrate.

In response to these filings, the Bankruptcy Court ruled that "the parties agreed that the Courts will make the allocation determination rather than an arbitrator or arbitrators." App'x 8. A few weeks earlier, the Superior Court reached the same result in the Canadian proceeding; it, too, denied a parallel motion to compel arbitration. (The Court of Appeal for Ontario has since denied leave to appeal that decision, stating that "there is no ambiguity" in the contract and "no suggestion . . . that the parties must submit the allocation issue to arbitration." Supplemental App'x 55, ¶¶ 7-8.) The Bankruptcy Court then approved a cross-border judicial allocation protocol.

The Joint Administrators sought leave to appeal the Bankruptcy Court's order regarding arbitration. Thereafter, the Bankruptcy Court certified a direct appeal from its order regarding arbitration pursuant to 28 U.S.C. § 158(d)(2)(B). This Court granted the petition to certify appeal of the arbitration issue on June 13, 2013. *See In re Nortel Networks Inc.*, No. 13-8049 (3d Cir. June 13, 2013).

The Joint Administrators separately moved the Bankruptcy Court for leave to appeal the Bankruptcy Court's order approving the cross-border judicial allocation protocol. The Bankruptcy Court denied the Joint Administrators' request to certify the allocation issue for interlocutory appeal. This Court then denied the Joint Administrators' petition to review the cross-border hearing dispute. *See In re Nortel Networks Inc.*, No. 13-8055 (3d Cir. June 13, 2013). The Joint Administrators applied to the U.S. District Court for the District of Delaware pursuant to 9 U.S.C. § 16(a) and 28 U.S.C. § 158(a). The District Court denied the Joint Administrators' request for leave to appeal the cross-border issue.

## II. The Bankruptcy Court Correctly Denied the Cross-Motion to Compel Arbitration.

This contract dispute begins and ends with the text of the Interim Funding Agreement. The language used by the parties in their agreement does not reveal an intent to arbitrate disputes about the allocation of the auction funds. Rather, the parties used language that indicated they would negotiate the procedure by which to divide the funds. Reasoning that the arbitration of disputes arising out of bankruptcy proceedings requires contractual consent—not the possibility of consent—the Bankruptcy Court denied the Joint Administrators' cross-motion to compel arbitration.

## A. *Legal Standards*[1]

Arbitration "is a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). "[A] party may not be compelled under the [Federal Arbitration Act] to submit to . . . arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010) (discussing class arbitration). To determine whether the parties agreed to arbitrate a dispute, we employ state principles of contract law. *See Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 532 (3d Cir. 2009). New York law governs the relevant parts of the Interim Funding Agreement. Thus, the agreement must be interpreted and enforced according to its plain meaning. *See Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).

---

[1] This Court has jurisdiction over the certified appeal of the order denying arbitration pursuant to 28 U.S.C. § 158(d)(2)(B) and 9 U.S.C. § 16(a)(1)(B). We review a bankruptcy court's conclusions of law under a *de novo* standard and its findings of fact under a clearly erroneous standard. *In re Mintze*, 434 F.3d 222, 227 (3d Cir. 2006). Because the Bankruptcy Court concluded as a matter of law that the Interim Funding Agreement did not contain an ambiguity and did not mandate arbitration, we exercise plenary review of the Bankruptcy Court's order. *See Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 159 (3d Cir. 2009).

**B.** *The Interim Funding Agreement*

Two features of Section 12 of the Interim Funding Agreement lie beyond dispute. The first is that Section 12(a) divorces the sale of Nortel's assets from an agreement between the sellers on how to divide the sale proceeds. Section 12(a) achieves this by stating that the debtors "shall not" condition their agreement to a particular sale on first agreeing to asset allocation. *See* App'x 1560.

The second undisputed feature of Section 12 is that it does not include a protocol for resolving disputes concerning the allocation of sale proceeds. Section 12(c) spells this out: the parties agree to "negotiate in good faith and attempt to reach agreement . . . on a protocol for resolving disputes concerning the allocation of Sale Proceeds." App'x 1560. The presence of an agreement to "negotiate" a protocol signals the absence of an agreement on that protocol.

The agreement to a sales framework in Section 12(a) and the agreement to negotiate an allocation protocol in Section 12(c) provide baselines for interpreting Section 12(b). The parties could have agreed to allocate the escrowed funds through arbitration. Or the parties could have agreed to negotiate the mechanism they would use to divide the escrowed funds without limiting themselves to arbitration. They could not have done both.

The text of the Interim Funding Agreement supports the second interpretation but not the first. Section 12—"Entry into Sale Transactions"—does not hint that the parties bound themselves to arbitrate. Considered as a whole, Section 12 creates escrow accounts; it does not disburse them. In fact, Section 12 does not mention arbitrators, arbitration, or arbitral associations. Of course, parties may agree to arbitration without using the word "arbitration." *See, e.g.*, *Chris*

11

*O'Connell, Inc. v. Beacon Looms, Inc.*, 652 N.Y.S.2d 24, 25 (N.Y. App. Div. 1997) ("mediate" meant "arbitrate"); *Penn Cent. Corp. v. Consol. Rail Corp.*, 441 N.Y.S.2d 266, 270 (N.Y. App. Div. 1981) ("appraisal" consistent with "arbitration"). But the absence of common signal words does not demonstrate that the parties agreed to take their disputes to a third party. It means the parties did not agree to arbitration in customary terms.

The parties did not agree to arbitrate in other words, either. The Joint Administrators disagree, arguing that the parties agreed to arbitrate by using the words "dispute resolver(s)" in Section 12(b) of the Interim Funding Agreement. The Court gives the words "dispute resolver(s)" their plain meaning. *See Greenfield*, 780 N.E.2d at 170. The noun "dispute" means "[t]he act of disputing or arguing against; active verbal contention, controversy, debate." *Dispute*, Oxford English Dictionary, http://www.oed.com/view/Entry/55213 (accessed Nov. 15, 2013). The noun "resolver" means "[a] person who or thing which answers a question, solves a doubt or difficulty, effects a resolution of a conflict or dispute, etc." *Resolver*, Oxford English Dictionary, http://www.oed.com/view/Entry/163739 (accessed Nov. 15, 2013). Thus, the plain meaning of "dispute resolver(s)" encompasses those persons or things that settle controversies. This includes arbitrators, as the Joint Administrators argue. But the words do not exclude courts. Indeed, as both parties acknowledge, courts have referred to themselves as dispute resolvers. *See, e.g.*, *Lewis v. Sullivan*, 279 F.3d 526, 528 (7th Cir. 2002) ("Federal courts are subsidized dispute-resolvers . . . ."). Therefore, the use of the words "dispute resolver(s)" does not, standing alone, show that the Nortel entities intended to arbitrate their disputes. The

words suggest a flexible concept that would permit, for example, arbitrators, courts, or mediators.

The context confirms that Section 12 does not imbue the words "dispute resolver(s)" with a narrower meaning than the words suggest for themselves. Recall that Section 12(b) forbids the release of escrowed funds in advance of either the parties' agreement or the determination of the "relevant dispute resolver(s) under the terms of the Protocol." App'x 1560. As defined by Section 12(c), the "Protocol" is "a protocol for resolving disputes concerning the allocation of Sale Proceeds . . . , which Protocol shall provide binding procedures for the allocation of Sales Proceeds." App'x 1560. Section 12(c) thus makes it possible to have a different "relevant dispute resolver" for different disputes, depending on the Protocol, or multiple dispute resolvers for one controversy and a single dispute resolver for another. The parties matched the breadth of the words "dispute resolver(s)" with an equally broad framework for negotiating a Protocol to determine how, and by whom, the parties would resolve allocation controversies. Nothing in the Interim Funding Agreement indicates that the "relevant dispute resolver[] under the terms of the Protocol" could not be a court.

Nonetheless, the Joint Administrators suggest that by contemplating a negotiated protocol, the parties revealed their intent to handle disagreements in a private forum. After all, the Joint Administrators reason, litigants must take a court's rules of procedure as they find them. This reasoning fails twice. First, the Joint Administrators ascribe too much rigidity to court procedures. Bankruptcy courts confront fluid legal and business problems. Consequently, bankruptcy courts must work with the parties before them to apply the bankruptcy framework to the demands and idiosyncrasies of

13

each case. The Bankruptcy Court and the parties did just that when, for example, they collaborated on a cross-border protocol. Second, the Joint Administrators' interpretation presupposes the "dispute resolver" will implement the Protocol. But, as written, the Interim Funding Agreement contemplates the Protocol will identify the "relevant dispute resolver(s)" for a given controversy. Negotiating a protocol therefore encompasses negotiations over dispute resolvers. By agreeing to negotiate which disputes would be settled by which dispute resolver (or resolvers), the parties did not thereby restrict themselves to settling all disputes by the same method, or agree that the method would be arbitration.

Because we conclude that the agreement contains no promise to arbitrate, our analysis ends at the text. "As a general rule, extrinsic evidence is inadmissible to alter or add a provision to a written agreement." *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013). New York law permits resort to extrinsic evidence, such as negotiating history, when an agreement contains an ambiguity. *See Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011). But the disputed portions of the Interim Funding Agreement were not "written so imperfectly that [they are] susceptible to more than one reasonable interpretation." *See id.* Therefore, no legal ambiguity exists. Indeed, we reject as unreasonable the Joint Administrators' view that the Interim Funding Agreement could be read to exclude the possibility of court intervention. As demonstrated above, that reading finds no support in the parties' agreement.

Although we do not look to extrinsic evidence to interpret the Interim Funding Agreement, we do note that the use of extrinsic evidence presents a special interpretative challenge for court-approved agreements. Consider Rule 9019(a) of the

14

Federal Rules of Bankruptcy Procedure, which empowers a bankruptcy judge to "approve a compromise or settlement," and Bankruptcy Rule 9019(c), which empowers a bankruptcy judge to "authorize" the parties to settle a controversy through "final and binding arbitration." If the parties' agreements could be discerned only by consulting extrinsic evidence, then a bankruptcy court might unknowingly use its Rule 9019 power to "approve" or "authorize" a contract with hidden promises. The Joint Administrators argue for just such a result by suggesting that the Bankruptcy Judge authorized arbitration when it approved the Interim Funding Agreement. But how could a judge "authorize" arbitration within the meaning of Rule 9019(c) if he or she did not recognize the parties had agreed to arbitrate? And how could creditors lodge their objections to arbitration if the agreement to arbitrate did not plainly appear on the face of the contract? These difficult questions underscore the usefulness of reducing agreements to arbitrate to plain language that can be recognized and enforced by courts examining only the text of the agreement. Parties wishing to arbitrate should not hide their intent to do so in the shadows of the text.

### III. The Court Declines to Review the Bankruptcy Court's Order to Proceed to Joint Hearing.

Separate from the contractual dispute, the Joint Administrators challenge the Bankruptcy Court's order to proceed with a joint hearing to determine allocation. A panel of this Court denied the Joint Administrators' petition to certify this issue for appellate review pursuant to 28 U.S.C. § 158(d)(2). *See In re Nortel Networks Inc.*, No. 13-8055 (3d Cir. June 13, 2013) (order denying cross-petition for permission to appeal). The District Court denied the Joint Administrators' separate motion for leave to take

15

interlocutory appeal from the Bankruptcy Court's order. *In re Nortel Networks Inc.*, No. 13 Civ. 757, Doc. 31 (D. Del. July 22, 2013) (Order Denying Motion for Leave to Appeal). Notwithstanding these rulings, the Joint Administrators invite us to consider the propriety of a joint hearing because the Bankruptcy Court decided to allocate the escrowed funds in the same order that it denied the motion to compel the arbitration of fund allocation.

We decline the invitation. Although this Court has jurisdiction over the "entire certified order" of the Bankruptcy Court, including the aspects of that order relating to a joint hearing, *see Tristani ex rel. Karnes v. Richman*, 652 F.3d 360, 366 (3d Cir. 2011), the ripe conflict before us concerns whether or not the parties agreed to arbitrate. The Joint Administrators' challenge to the joint hearing and its procedures would more appropriately follow the hearing, when the parties have developed the record and raised their procedural objections to the Bankruptcy Court.

## IV.    Conclusion

We affirm the U.S. Bankruptcy Court for the District of Delaware's order denying the Joint Administrators' cross-motion to compel arbitration. The Bankruptcy Court correctly determined that the plain language of the Interim Funding Agreement did not contain an arbitration clause. The Joint Administrators' reliance on the words "dispute resolver(s)" does not show otherwise. In context, the words "dispute resolver(s)" indicate that the parties allowed themselves latitude to select courts or arbitrators or others to adjudicate the parties' disputes. To respect that contractual latitude, we reject the idea that the parties must arbitrate disputes over asset allocation.

The Court declines to reach the merits of the dispute about the joint hearing.