**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1975
_____

ALIMENTS KRISPY KERNELS, INC.,
Appellant

v.

NICHOLS FARMS a/k/a NICHOLS FAMILY FARMS a/k/a
NICHOLS PISTACHIOS

___

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 3:13-cv-5995)
District Judge: The Honorable Peter G. Sheridan
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
November 18, 2016

Before: AMBRO, SHWARTZ, and FUENTES, *Circuit
Judges*

(Opinion Filed: March 21, 2017)

Andrea L. D'Ambra, Esq.
John F. Tully, Esq.
Norton Rose Fulbright
1301 Avenue of the Americas
New York, NY 10019

Jami M. Vibbert, Esq.
Venable
1270 Avenue of the Americas
24th Floor, Rockefeller Center
New York, NY 10020

*Counsel for Appellant*

Samuel Feldman, Esq.
Orloff Lowenbach Stifelman & Siegel
101 Eisenhower Parkway
Suite 400
Roseland, NJ 07068

*Counsel for Appellee*

_____

OPINION
_____


FUENTES, *Circuit Judge*.

The plaintiff, Aliments Krispy Kernels, brought this suit to enforce an arbitration award it received against the defendant, Nichols Farms, in a contract dispute. The award,

based on an alleged breach of contract, was in the sum of $222,100. Claiming that the parties never agreed to arbitrate, Nichols Farms did not attend the arbitration. Aliments filed a petition to confirm the arbitration award and Nichols cross-petitioned to vacate it. The District Court denied Aliments' petition to confirm and granted Nichols's petition to vacate. Because we find that an issue of material fact exists as to whether the parties agreed to arbitrate, we will vacate the District Court's judgment and remand for further proceedings.

## I. Background

In August 2012, Aliments, a Canadian snack purveyor, contacted its American broker, Sterling Corporation, to purchase thousands of pounds of raw pistachios. Sterling, in turn, contacted Pacific/Atlantic Crop Exchange, another agricultural commodities broker. Learning of Aliments' interest in purchasing pistachios, Pacific called Nichols, a pistachio grower in California. Nichols agreed to the proposed quantity and price. One month later, in September 2012, Sterling contacted Pacific with a second order of pistachios from Aliments. Pacific reached out to Nichols once again. Nichols agreed to the proposed quantity and price of this second order.

To confirm the two orders, Sterling issued sales confirmations for the August and September orders and sent copies to Aliments and Pacific. Pacific did not forward the Sterling sales confirmations to Nichols, however, and instead issued its own set of sales confirmations, which were sent to

Nichols and Sterling. [1] Neither Aliments nor Nichols was aware that two sets of sales confirmations existed. The two sets contained the same terms, including a thirty-day credit term. However, while Sterling's sales confirmations contained arbitration clauses, it appears that some but not all of the sales confirmations generated by Pacific contained arbitration clauses.[2]

Aliments evidently believed that the Sterling sales confirmations, though unsigned by either party, represented a binding contract to purchase pistachios from Nichols, on credit with payment due thirty days from delivery, "as usual."[3] Nichols, on the other hand, thought that the thirty-day credit term was but a placeholder, as were all the terms in the Pacific sales confirmations except for the price and quantity terms. In support, the president of Nichols submitted a declaration explaining that "[w]hen Nichols receives a request from a customer to purchase product on credit, [it] obtain[s] a credit report and then [he, the president of Nichols, is] the one who makes the decision about whether to

---

[1] A 257-58 (Pacific never forwarded the sales confirmations from Sterling to Nichols because it is its business practice "to not forward to the seller unsigned confirmations. Instead, [it] wait[s] to receive (and pass on) either a written purchase order or a signed confirmation from the buyer, which [it] then forward[s] to the seller, and/or a written contract or sales acknowledgement from the seller, reflecting a firm offer to purchase product."); A 47 (president of Nichols declaring that he had never seen the Sterling sales confirmations).

[2] There is a dispute as to which versions of the sales confirmations were sent to Nichols and Sterling.

[3] A 101-02.

sell product on credit and on what terms and conditions."[4] The president of Pacific corroborated this practice, and submitted a separate declaration, stating that he had no authority from Nichols "to commit to any credit terms or to bind Nichols to any credit terms."[5] He avers that he created the sales confirmations based on a "template," changing only the amount and price to reflect this particular transaction, leaving "product description, packaging, addresses, and terms" as-is from a prior transaction.[6] "Based on [his] many years in the commodity brokerage business," the president of Pacific "understood that Nichols, in response to [Aliments'] offer, had the right to perform a credit check on [Aliments], and require security or advance payment if it thought it to be necessary."[7]

After the sales confirmations were created, Nichols requested, and Aliments submitted, a credit application. This credit application was denied due to Aliments' previous late payments to Nichols, its involvement in a lawsuit with another farmer, and the increased difficulty of collection with any foreign corporation. In short, Nichols would not deliver its pistachios until it received payment from Aliments first.

Aliments protested that advance payment is a highly irregular request that is inconsistent with Nichols's past practices with Aliments and with industry standards. Nonetheless, it continued to attempt to work with Nichols to come to an amiable resolution. However, the parties were

---

[4] A 45.

[5] A 74.

[6] *Id.*

[7] *Id.*

ultimately unable to come to an agreement on a payment method. Finally, Aliments bought pistachios from another vendor at a higher price. Seeking to recoup the extra cost, Aliments initiated arbitration proceedings in accordance with the arbitration clauses contained in the Sterling sales confirmations that were unseen and unsigned by Nichols.

Despite being notified of the arbitration, Nichols elected not to attend. Aliments was awarded $222,100 in damages against Nichols by the arbitration panel. Sent a copy of this award, Nichols refused to satisfy it. Finally, Aliments filed a petition to confirm the arbitration award in the District of New Jersey. In response, Nichols cross-petitioned to vacate the arbitration award.

After months of discovery, the District Court denied Aliments' petition and granted Nichols's cross-petition to vacate because no genuine issue of material fact existed as to whether the parties failed to enter into "an express unequivocal agreement" to arbitrate.[8] We disagree, and for the reasons set forth below we will vacate and remand for further proceedings.[9]

---

[8] A 9.

[9] The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) and 9 U.S.C. § 9. We have jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1291 and 9 U.S.C. § 16(a). "On appeal from a district court's ruling on a motion to confirm or vacate an arbitration award, we review its legal conclusions de novo and its factual findings for clear error." *Opalinski v. Robert Half Int'l Inc.*, 761 F.3d 326, 330 (3d Cir. 2014) (emphasis added) (quoting *Sutter v. Oxford Health*

## II.    Discussion

On appeal, Aliments argues that the District Court made two legal errors: first, the Court "erred in using a legal standard requiring 'an express unequivocal agreement' to arbitrate prior to binding a party to arbitration";[10] and second, it erred in finding, as a matter of law, that the parties did not enter into such an agreement to arbitrate. We will address each of these arguments in turn.

### A.    Legal Standard

The parties' dispute regarding the proper legal standard for determining whether the parties have made an agreement to arbitrate is the result of courts' changing attitude towards the Federal Arbitration Act ("FAA"). In 1980, we held in *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.* that "[b]efore a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect."[11] In 1994, we reiterated this standard in *Kaplan v. First Options*.[12] That case was appealed to the Supreme Court; and, in a decision affirming on other grounds, the Court held that, "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-

---

*Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012), *aff'd*, 133 S. Ct. 2064 (2013)).

[10] Appellant's Br. at 2

[11] 636 F.2d 51, 54 (3d Cir. 1980).

[12] 19 F.3d 1503, 1512 (3d Cir. 1994) (internal quotations omitted).

law principles that govern the formation of contracts."[13] Though the Court's holding appears to be a departure from our express and unequivocal standard, that standard was never expressly overruled.

Over a decade later, we reexamined the express and unequivocal standard in *Century Indemnity Company v. Certain Underwriters at Lloyd's, London*.[14] We reviewed how we have used the express and unequivocal standard in the past, and acknowledged that the express and unequivocal language has been used, confusingly, to establish two different standards:

> On the one hand, we have stated the "express" and "unequivocal" requirement to explain that genuine issues of fact as to whether there is an agreement to arbitrate preclude compelling a party to submit to arbitration; on the other, we have used this language to state a substantive standard that applies to the determination of an arbitration agreement's enforceability as a general matter.[15]

In *Century Indemnity*, we held that the latter use of express and equivocal as a substantive standard is no longer valid after the Supreme Court's decision in *First Options of Chicago, Inc. v. Kaplan* held that courts should generally look to the relevant state contract law to determine whether a valid

---

[13] *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).
[14] 584 F.3d 513 (3d Cir. 2009).
[15] *Id.* at 530 (footnote omitted).

8

agreement to arbitrate exists.[16]  But we did not strike down the use of the express and unequivocal requirement to the extent that it "requires that there not be a genuine issue of material fact as to an arbitration agreement's existence before a district court may determine whether the agreement exists as a matter of law."[17]  Furthermore, in *Century Indemnity*, we repeatedly made clear that, despite the express and unequivocal language, "when determining whether there is a valid agreement to arbitrate between the parties . . . we apply ordinary state-law principles of contract law," and no more.[18]

Here, the District Court clearly used the express and unequivocal standard to explain that it will decide the petition to confirm the arbitration award and motion to vacate as a matter of law only if there is no "genuine issue of fact concerning the formation of the contract."[19]  Therefore, to the extent that the District Court meant to impose no more stringent standard on the arbitration agreement than that permissible under state law, it did not err.  However, Aliments' confusion on this matter is understandable, and we recommend that district courts avoid using the "express and

---

[16] *Id.* at 531 (citations omitted).

[17] *Id.* at 530.

[18] *Id.* at 532; *see also id.* at 531 ("When deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.  The relevant state law here, for example, would require the court to see whether the parties objectively revealed an intent to submit the arbitrability issue to arbitration." (quoting *First Options*, 514 U.S. at 944)).

[19] A 10.

unequivocal" language. The legal standard is simply that we apply the relevant state contract law to questions of arbitrability, which may be decided as a matter of law only if there is no genuine issue of material fact when viewing the facts in the light most favorable to the nonmoving party.[20]

Having established that the District Court, despite unclear language, used the correct standard, we turn next to Aliments' second question on appeal: whether the District Court correctly determined that the parties did not enter into an agreement to arbitrate as a matter of law.

### B.     Analysis

As previously stated, the ultimate inquiry of whether the parties agreed to arbitrate is governed by the applicable state law. In this case, the question of which state law should apply is muddled. Aliments is a Canadian company seeking to confirm an arbitration award issued in New Jersey by an arbitration panel that used New York law against Nichols Farms, a California company, for breach of a contract to deliver goods in California that was largely negotiated by a broker based in Georgia and a broker based in California. Before the District Court, Aliments argued for New York law to apply, and Nichols argued for California law to apply. The District Court, however, made no findings about which state law applied. Instead, based solely on general principles of contract law, it granted Nichols's petition to vacate the

---

[20] *See Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 219-20 (3d Cir. 2014); *In re Nortel Networks Inc.*, 737 F.3d 265, 270 (3d Cir. 2013); *Invista S.A.R.L. v. Rhodia, S.A.*, 625 F.3d 75, 84 (3d Cir. 2010).

arbitration award due to "a lack of evidence that any agreement or sales confirmation was ever entered," and because "there is nothing to demonstrate that Nichols Farms intended to arbitrate the matter."[21] We disagree with this terse analysis.

Because we look to applicable state law to determine whether the parties agreed to arbitrate, we begin with a choice-of-law analysis. To determine the applicable state law, we use the forum state's choice-of-law rule. The first step in any choice-of-law inquiry under New Jersey law requires the court to determine whether there is an actual conflict between the laws of the potential forums.[22] "That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them."[23] If there is no actual conflict, "the inquiry is over and, because New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same."[24] If there is an actual conflict, then the court must determine "which forum has the most significant relationship with the parties and the contract."[25]

---

[21] A 9.

[22] *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013).

[23] *P. V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008) (citation and internal quotation marks omitted).

[24] *Lebegern v. Forman*, 471 F.3d 424, 428 (3d Cir. 2006).

[25] *Forestal Guarani S.A. v. Daros Int'l, Inc.*, 613 F.3d 395, 401 (3d Cir. 2010) (citing *State Farm Mut. Auto. Ins. Co. v. Estate of Simmons*, 417 A.2d 488, 491 (N.J. 1980)).

On appeal, the parties continue to rely on different state laws: Aliments relies on New York law and Nichols relies on New Jersey law.[26] Both parties, however, agree that there is no actual conflict between New York law and New Jersey law.[27] Consequently, we will apply New Jersey law on contract formation.

Under New Jersey law, "[a]n enforceable agreement requires mutual assent, a meeting of the minds based on a common understanding of the contract terms."[28] A party who assents to a contract, however, is bound by all the terms of a contract, even those terms that the party did not read or specifically discuss.[29] In addition to mutual assent, the New Jersey Uniform Commercial Code requires that "a contract for the sale of goods for the price of $500 or more" be set forth in writing and "signed by the party against whom enforcement is sought or by his authorized agent or broker."[30] But where the sales agreement is between merchants, the signature requirement is satisfied "if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents," and the receiving party does not give a

---

[26] Appellant Supp. Ltr. Br. at 2; Appellee Supp. Ltr. Br. at 1.

[27] Appellant Supp. Ltr. Br. at 2; Appellee Supp. Ltr. Br. at 2.

[28] *Morgan v. Sanford Brown Inst.*, 137 A.3d 1168, 1180 (N.J. 2016) (citing *Atalese v. U.S. Legal Servs. Grp., L.P.*, 99 A.3d 306, 312-13 (N.J. 2014)).

[29] *See Henningsen v. Bloomfield Motors, Inc.*, 161 A.2d 69, 84 (N.J. 1960).

[30] N.J. Stat. Ann. § 12A:2-201(1).

"written notice of objection to its contents . . . within ten days after it is received."[31]

Here, neither party has persuaded us that, under New Jersey law, no issues of material fact exist as to whether the parties agreed to arbitrate. We turn to appellant Aliments' arguments first. Aliments asserts that Nichols "clearly intended to be bound by the [Pacific sales confirmations] and never mentioned any dispute regarding the arbitration clause" contained therein.[32] Specifically, Aliments points to evidence in the record suggesting that Nichols acted as though it were under a contractual obligation to sell the pistachios to Aliments. For example, during the negotiations that took place in an effort to resolve their dispute, Nichols suggested that Aliments "void[] the existing purchase orders issued by Pacific Atlantic"[33] and sign a new agreement with substantially similar sales terms but requiring pre-payment. Separately, in an internal email from the CEO of Nichols, the sales team was told to "delete the contract obligation."[34]

Aliments' argument fails due to at least two issues of material fact. First, as Nichols points out, there is a factual dispute as to whether the Pacific sales confirmations that were actually emailed to Nichols and Aliments contained arbitration clauses.[35] The record contains versions of the Pacific sales confirmations that do include the arbitration

---

[31] *Id.* § 12A:2-201(2).
[32] Appellant's Br. at 18.
[33] A 210.
[34] A 213
[35] *See* Appellee Supp. Ltr. Br. at 3.

13

clauses,[36] and versions that do not.[37]   Second, the record suggests that even though Nichols may have referred to the sales confirmations as "purchase orders" or "contract obligation[s],"[38] that does not necessarily mean that Nichols viewed the Pacific sales confirmations as binding contractual agreements.  For example, Nichols's Regional Sales Manager stated that it is his understanding that Nichols does not "accept" buyers' offers to purchase until they pass a credit check.[39]   Indeed, after Nichols received the Pacific sales confirmations, it continued to request a credit application from Aliments.  Furthermore, the president of Pacific corroborated the fact that, to the best of his knowledge based on industry standards, the parties did not enter into a binding contract because neither party ultimately signed the sales confirmations.[40]   In sum, we cannot hold definitively that Nichols assented to binding sales agreements containing arbitration clauses.

At the same time, Nichols's arguments asking us to affirm the District Court's grant of its petition to vacate the arbitration award also fail.  Nichols makes three categories of arguments.  First, it relies on the fact that neither party signed any of the sales confirmations and that the rules imposed by the Association of Food Industries, the chosen arbitrator, required "the presence of signatures by both parties."[41]  This reliance is misplaced.  As reiterated above, under New Jersey

---

[36] A 29; A 31.

[37] A 237; A 243.

[38] A 210; A 213.

[39] A 84.

[40] **A 75.**

[41] Appellee's Br. at 11.

state law, bills of sale between two merchants need not be signed in order to be binding as long as certain other conditions are met. The arbitrator's own procedural rules, such as requiring both parties' signatures, are to be decided by the arbitrator, rather than the court, unless otherwise provided for in the contract.[42] The lack of signatures clearly did not prevent the arbitrator in this case from concluding that Aliments and Nichols entered into a binding sales contract, and that is not a conclusion that we have been asked to review. Thus, our review is limited to examining whether, within the bounds of New Jersey state law, the parties made an agreement to arbitrate, and under New Jersey law, a lack of a signature in an agreement between two merchants is simply not dispositive.

Second, Nichols argues that the Pacific sales confirmations "fail to satisfy the merchant's exception to the general signature requirement"[43] because they are not

---

[42] *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (While, generally, "a gateway dispute about whether the parties are bound by a given arbitration clause raises a question of arbitrability for a court to decide . . . . [P]rocedural questions which grow out of the dispute and bear on its final disposition are presumptively *not* for the judge, but for an arbitrator, to decide."(internal quotations and citations omitted)); *see also BG Grp., PLC v. Republic of Arg.*, 134 S. Ct. 1198, 1207 (2014) ("[C]ourts presume that the parties intend arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration.").

[43] Appellee Supp. Ltr. Br. at 4.

writings "in confirmation of the contract[s]."[44]  Specifically, Nichols argues that the Pacific sales confirmations fail because they "bear blank signature lines for the buyer and seller and still require sales confirmation numbers from Nichols Farms."[45]  We disagree with Nichols's proposition that these deficiencies rendered the Pacific sales confirmations incomplete as a matter of law where the sales confirmations included all the essential terms of a sales contract: price, quantity, delivery, and payment method.[46]

---

[44] N.J. Stat. Ann. § 12A:2-201(2).

[45] Appellee Supp. Ltr. Br. at 4.

[46] *Cf. Berg Agency v. Sleepworld-Willingboro, Inc.*, 346 A.2d 419, 422 (N.J. Super. Ct. App. Div. 1975) ("[P]arties may effectively bind themselves by an informal memorandum where they agree upon the essential terms of the contract and intend to be bound by the memorandum, even though they contemplate the execution of a more formal document."). Nichols also argued that we should not address any arguments relying on the Pacific sales confirmations because "Aliments did not rely on the [Pacific] sales confirmations in its petition to confirm" before the District Court.  Appellee's Br. at 12. This is simply a misrepresentation of the facts.  Aliments, in its original petition to confirm arbitration award, specifically referenced, and attached, the Pacific sales confirmations as bases for confirming the award.  Mem. of Law in Support of Petition to Confirm Final Arbitration Award, *Aliments Krispy Kernels v. Nichols Farms*, No. 3:13-cv-5995 (D.N.J. Oct. 8, 2013), ECF No. 1-1.  There may, however, exist a question as to whether the Pacific sales confirmations satisfy the merchant's exception to the general statute of frauds as writings "in confirmation of the contract[s]" because they may not sufficiently make reference to prior oral agreements.

Third and last, Nichols argues that the merchant's exception does not apply because Nichols "advised [Pacific] before and after the confirmations issued that it wanted payment terms not reflected therein and, the day before the second confirmation, told [Pacific] to have '[its] buyer' comply with the terms Nichols Farms wanted."[47]   The merchant's exception applies to unsigned written

*See Trilco Terminal v. Prebilt Corp.*, 400 A.2d 1237, 1240 (N.J. Super. Ct. App. Div. 1979) (holding that the merchant's exception in N.J. Stat. Ann. § 12A:2-201(2) is satisfied only if the written confirmation indicates "that a binding or completed transaction has been made").   Nichols did not make this argument, however, and has thereby conceded that the Pacific sales confirmations sufficiently reference a prior oral agreement between the parties.   Moreover, New Jersey's interpretation of N.J. Stat. Ann. § 12A:2-201(2) is in direct conflict with New York's interpretation of the same Uniform Commercial Code provision.   In *Bazak International Corp. v. Mast Indus., Inc.*, 535 N.E.2d 633, 636 (N.Y. 1989), the New York Court of Appeals explicitly "reject[ed] the exacting standard proposed by *Trilco* and *Norminjil* [a subsequent federal case applying *Trilco*] as inconsistent with the letter and spirit of the relevant UCC sales provisions."   Instead, the Court of Appeals held that written confirmations are sufficient to satisfy the merchant's exception so long as "they afford a basis for believing that they reflect a real transaction between the parties."   *Id.* at 638.   Here, Nichols explicitly conceded that "there is no conflict between the applicable New York and New Jersey rules," and so we can only surmise that Nichols does not wish to apply *Trilco* to this case.  Appellee Supp. Ltr. Br. at 1.

[47] Appellee Supp. Ltr. Br. at 7.

confirmations "unless written notice of objection to [their] contents is given within ten days after [they are] received."[48] Nichols posits that its repeated requests for Aliments to complete a credit application satisfy, as a matter of law, the exception to the exception. We cannot so find because the record before us lacks evidence of any written notice of objection. Instead, we have an email from Nichols to Pacific, dated one day before the September Pacific sales confirmation was sent, requesting Pacific to "remember to send the credit application to [its] buyer at the same time [it] sends [Nichols] the P[urchase] O[rder]."[49] In deposition testimony, the president of Nichols stated that he assumes that "there would either have been something in writing or something over the phone" to inform Pacific that, though Nichols had agreed to the quantity and price as reflected in the sales confirmations, it did not agree to sell the pistachios on credit with payment due in 30 days.[50] He then added that "[q]uite often it's done verbally."[51] However, he also testified that there was correspondence "from the beginning of August into the end of November about Aliments [and] the credit process with Aliments," suggesting that, perhaps, there may have been writings between the parties but it is not clear from this testimony that any of them embody the "written objection" required under New Jersey law.[52] In short, there remains an issue of material fact as to whether Nichols sent a written notice of objection regarding the Pacific sales confirmations within ten days after they were received.

---

[48] N.J. Stat. Ann. § 12A:2-201(2).

[49] A 89.

[50] A 183.

[51] *Id.*

[52] A 184.

\* \* \*

In sum, contrary to the District Court's analysis that there is "a lack of evidence that any agreement or sales confirmation was ever entered," we find that multiple issues of material fact exist, precluding us from entering judgment in favor of either party.[53]

---

[53] A 9.

## III.    Conclusion

For the foregoing reasons, we will vacate and remand to the District Court for further proceedings.